# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CARRIE STONEBARGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-CV-795-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Carrie Stonebarger ("Stonebarger"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Stonebarger's applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Stonebarger appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Stonebarger was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## Claimant's Background

Stonebarger testified that she had last worked in approximately July 2006, when she had been working as a certified nurse's aide in nursing home settings. (R. 29). She quit work because even though her employer gave her accommodations, the sitting required by the job was not something she could do. *Id.*

At the time of the hearing on March 31, 2009, Stonebarger was 5' 3 ½", and she testified that she weighed around 200 pounds. (R. 30). In July 2006, the time she asserted she became disabled, she weighed around 140 pounds, and she believed the weight gain was due to depression. *Id.*

Stonebarger testified that when she last worked, and at the time of the hearing, she rocked back and forth while she sat in an attempt to ease the pain, to take "pressure off my right side to go to my left." (R. 31). Most of the time when she was in her home, she was in her recliner with her legs elevated. *Id.* She elevated her legs about 70% of the time, because her back hurt and her right leg hurt. (R. 32). When sitting in a recliner after having taken her pain medications, she would rate her pain as about a 5 on a scale of 1 to 10. *Id.* She described it as a throbbing in the middle of her back and shooting pains down the back of her right leg, all the way to the sole of her foot. (R. 32-33). She had tingling and numbness in her entire right leg. (R. 33). The pain would increase to about 8 or 9 if she washed dishes or cleaned her house. *Id.* If she washed the dishes, she would lean on the counter, or she would use a very high chair that allowed her to sit somewhat. *Id.* She had tried spinal injections, exercise, and hot and cold applications to try to help her back pain, and she felt that surgery was her last resort. (R. 42-43).

Stonebarger testified that she could stand or walk for about 15 to 20 minutes before she would need to change positions due to the pain. (R. 33-34). While standing, she still rocked back and forth. (R. 34). She could sit for about 10 or 15 minutes before needing to change positions. *Id.* She sometimes used a cane to help walk because her right leg would sometimes give out. (R. 34-35). She fell about two or three times a month. (R. 35). She could probably lift 5 or 10 pounds. *Id.*

On a typical day, she would get her children up to go to school. *Id.* She got dressed, and she would try to wash dishes. *Id.* Then she would sit in her recliner and elevate her leg most of the day.

(R. 35-36).  If she had to vacuum, she would do half a room, and then sit down and elevate her leg.  (R. 36).  There would be about three days a month that she would not be able to leave her house.  (R. 37).

The pain affected her ability to sleep, and she never had a full night's sleep.  (R. 40-41).  Even after taking pain medication and sleep medication, she would wake up from the pain and take more medication.  (R. 41).  She slept four hours at night, but she napped during the day when she took her medication, which made her drowsy.  *Id.*  She had lots of side effects from her medications.  *Id.*

She had asked to change primary care physicians through Medicaid because she didn't agree with the care she was receiving.  (R. 38-39).  At the time of the hearing, she was waiting to see her new primary care physician, and was hopeful that she would receive a referral to a surgeon for evaluation.  *Id.*

Stonebarger testified that she was seeing Dr. Shadid and Family & Children's Services for mental health treatment.  (R. 39-40).  She had been diagnosed with depression, obsessive-compulsive disorder ("OCD"), and post-traumatic stress disorder ("PTSD").  (R. 40).  She said that her depression prevented her from doing activities, and she didn't want to go out in public.  *Id.*  She had feelings of sadness and hopelessness.  *Id.*  She was short-tempered and testy, and said that she didn't "belong with people."  (R. 39).  Her depression worsened when her back worsened.  (R. 42).  She did not like to be in public, and she sometimes cried.  *Id.*

The administrative transcript shows that Stonebarger saw Andrew F. Revelis, M.D. at the referral of Tracy Smith, M.D. on May 4, 2004.  (R. 207-09).  Dr. Revelis recounted a history of Stonebarger having been in a motor vehicle accident in January 2004, with gradually increasing axial back and right lower extremity pain from that time.  (R. 207).  At the time, Stonebarger was

taking Percocet four times a day. (R. 208). An MRI of her lumbar spine showed degenerative changes at L4/L5 and L5/S1. *Id.* On physical examination, she had full range of motion, and 5/5 bilateral strength in her legs. *Id.* She had negative straight leg raising and negative Patrick's bilaterally. *Id.* Her gait was within normal limits. *Id.* She had some positive paraspinous tenderness on palpation. *Id.* Dr. Revelis' impressions were lumbar spondylosis without myelopathy, lumbar degenerative disc disease, and bilateral lower extremity radiculitis. (R. 209). He planned to perform a translaminar lumbar epidural spinal injection at L4/L5, and to reduce Stonebarger's Percocet gradually. *Id.* Revelis performed the procedure on May 21, 2004. (R. 210-11).

Dr. Revelis wrote a letter to Dr. Smith dated August 30, 2004, stating that he saw Stonebarger for follow up, and Dr. Revelis said that Stonebarger had poor response to injection therapy and continued to take Percocet four times a day. (R. 214). Dr. Revelis said that he wanted to have a provocative discogram "to better delineate disc pathology" so that he could decide what course of therapy to recommend so that Stonebarger could avoid surgical intervention. *Id.* On January 28, 2005, Dr. Revelis performed a lumbar discogram. (R. 215-17). Dr. Revelis found that Stonebarger's disc at L3/L4 was normal, but the procedure resulted in pain and abnormal results for the L4/L5 disc. (R. 216-17). He did not inject the L5/S1 disc because it had severely degenerated disc height and the procedure would not provide helpful information. *Id.* He believed that surgical intervention might be appropriate because the L3/L4 disc was normal. (R. 217). On March 8, 2005, he wrote to Dr. Smith that he was referring Stonebarger to Dr. Mangels for evaluation and a surgical opinion. (R. 219).

On May 30, 2006, Stonebarger was seen by Lori Clark, D.O. at OSU Physicians Family Medicine Clinic ("OSU Clinic") for an initial visit. (R. 283-87). Her chief reason for the visit was that she wanted a prescription for Adderall, and she related a history of treatment for ADHD

(attention deficit hyperactivity disorder). (R. 283). Stonebarger also related that she had degenerative disk disease, and had been on a Duragesic patch and Percocet until one month previous to the visit. *Id.* She stated that she did not like being on narcotic pain medications, but did not want surgery, and so she was trying to control the pain with Advil and conservative measures. *Id.*

On July 31, 2006, Stonebarger returned to the OSU Clinic with a complaint of ongoing back and right leg pain that she said had been present for several years. (R. 279). A note appears to state that Stonebarger was a "pain med addict." *Id.* The impressions included Stonebarger's history of severe low back degenerative disease with a failed epidural steroid injection, and it also states that Stonebarger had a history of narcotics addiction. (R. 280). Ultram was prescribed, and Stonebarger was given referrals for an orthopedic evaluation and an ophthalmology evaluation to address vision changes that Stonebarger described experiencing. *Id.*

On August 20, 2006, Stonebarger presented to the Saint Francis emergency room with left ankle pain after falling down stairs. (R. 260-69). An x-ray of Stonebarger's lower back done at that time showed moderate to severe degenerative disk disease at L5/S1. (R. 261). The nurse's observation notes state that Stonebarger was difficult to assess and uncooperative. (R. 265). The notes state that Stonebarger ambulated around the room with an exaggerated limp and screamed and yelled. *Id.* "Hysterical crying" stopped when Stonebarger was given a pain injection, and when she left upon discharge, she refused crutches. *Id.*

Stonebarger returned to the OSU Clinic on August 22, 2006, and the notes give the history of Stonebarger having been at Saint Francis on August 20. (R. 277). She was still complaining of lower back pain and requested narcotic pain medications. *Id.* Dr. Clark wrote her impressions as acute left ankle strain and chronic back pain with history of narcotic dependence. (R. 278). The record states that Stonebarger refused prescriptions for Ultram or NSAIDS, but requested a pain

management referral, and she was given information to reschedule orthopedic and ophthalmology appointments that she had missed. *Id.*

Stonebarger presented to the Saint Francis emergency room on a series of occasions with facial swelling or sores that tested positive for MRSA (methicillin-resistant staphylococcus aureus) in September and October 2006. (R. 237-59). Stonebarger presented to the Saint Francis emergency room on December 8, 2006 with pain and swelling of her left index finger and hand that also was MRSA positive. (R. 228-36). She went to the Saint Francis emergency room again on May 30, 2007 for a similar infection on her face. (R. 330-34). On December 6, 2007, a similar episode involved swelling of her left eye. (R. 363-68).

Stonebarger returned to the OSU Clinic on October 26, 2006 for follow up of her back pain. (R. 274-75). The hand-written note is not completely clear but appears to state that she wanted a referral to Dr. Yarborough because she had an epidural injection that was very painful and that did not help her pain. *Id.*

Records reflect that Stonebarger presented at the emergency room at Saint Francis on January 18, 2007 for exacerbation of her chronic back pain after falling on ice. (R. 221-27). The form notes that Stonebarger said she had been told she needed surgery but she had "chickened out." (R. 224).

Stonebarger returned to the OSU Clinic on February 6, 2007 with a chief complaint of severe back pain that had been going on for two weeks, and it appears that she was seen by Malinda Arrington, ARNP (Advanced Registered Nurse Practitioner). (R. 272-73). The note says that Stonebarger saw Dr. Anagnost who referred her to Dr. Swanson. (R. 272). The note continues saying that Stonebarger really wanted surgery, but Dr. Anagnost disagreed. *Id.* It states that Stonebarger complained of increased sharp pains in her right leg, along with numbness and

occasional weakness and falls. *Id.* The examination notes state that Stonebarger was crying, and straight leg raising was positive on the right. *Id.* The notes also say that Stonebarger was very angry that she was not getting narcotics. *Id.* The hand-written notes appear to say that Stonebarger was walking with a cane and had pain with all motion and pain on palpation over the L5/S1 portion of her spine. *Id.* The impression was lower back pain with myelopathy. She was given prescriptions, but a note appears to state that Stonebarger said that she wouldn't take them because they weren't pain medications. (R. 273). Ms. Arrington wrote a "To Whom It May Concern" letter dated February 16, 2007, stating that Stonebarger suffered from chronic low back pain from degenerative disc disease, with an encroachment of her nerve that caused pain and weakness in her lower extremities. (R. 271). The letter asked that Stonebarger be allowed to participate in the Sooner Ride program because "it is painful to walk or stand for long periods." *Id.*

Stonebarger went to the OSU Clinic on August 29, 2007 with complaints of nausea and abdominal pain, and it appears that she was told to go to the emergency room. (R. 335-36).

The administrative transcript contains records that are apparently from the offices of Raymond F. Sorensen, D.O. for 2007 and January 2008, but the hand-written notes are largely illegible. (R. 288-90, 344-53, 371-73). There is a type-written report reflecting that Dr. Sorensen performed an injection into the right sacroiliac joint on December 26, 2007. (R. 369-70).

Stonebarger saw Kyle Mangels, M.D. of Oklahoma Spine & Brain Institute for the first time on April 8, 2008. (R. 398-400). On examination, Dr. Mangels found Stonebarger's gait to be normal, her back range of motion was mildly limited in all directions, and she had questionable weakness of her right foot that might have been "somewhat pain limited." (R. 399). Other than this, she had normal strength, reflex, and sensory function in all extremities. *Id.* He wanted a new MRI scan. (R. 400). The scan was done on June 3, 2008. (R. 401). It showed degenerative disc space

narrowing at L4/L5 and more prominently at L5/S1. *Id.* There was also mild broad based disc bulging at L5/S1. *Id.* Dr. Mangels reviewed the results with Stonebarger on June 12, 2008. (R. 396-97). Dr. Mangels recommended a posterior lumbar fusion at L5/S1. *Id.* On July 2, 2008, Dr. Mangels amended his recommendation after reviewing the report of the lumbar discogram that was done by Dr. Revelis in 2005. (R. 395). The procedure would be the same, but would be a two-level posterior lumbar fusion of the L5/S1 and the L4/L5 levels. *Id.*

There are also hand-written notes that the administrative record reflects are from Dr. Joseph Knight, Infectious Disease and Pain Management of Tulsa, dating from May 20, 2008 to February 13, 2009. (R. 376-93). On May 20, 2008, Dr. Knight took Stonebarger's history, and his impressions were chronic low back pain, depression, sleep dysfunction, and ADHD. (R. 392-93). Three medications were prescribed. (R. 393). At a follow-up visit on June 20, 2008, Dr. Knight considered Stonebarger to be doing well and much better than the May visit, with her pain under "moderately good control." (R. 390). He recorded that Stonebarger said her neurosurgeon's opinion was that surgery was "inevitable." *Id.* Dr. Knight kept her medications as previously prescribed. (R. 391).

On July 21, 2008, Dr. Knight reported that Stonebarger was doing well, she had no problems to report, she was sleeping well, and her pain was adequately controlled. (R. 388). On August 19, 2008, Stonebarger was recovering from an episode of food poisoning. (R. 386). She reported that her sleep was "suboptimal," and Dr. Knight started her on a trial of another medication. (R. 386-87). On September 18, 2008, Stonebarger was doing well, she had no complaints, and her pain was under control. (R. 384-85). October and November visits were similar. (R. 382-83). In December, her medications were adjusted. (R. 380-81). In January, Stonebarger reported that her pain medications were working well, but she wanted help with "breakthrough" pain that she apparently had if she

stood or sat for long. (R. 378). Her medications were adjusted. (R. 378-79). On February 13,

2009, Stonebarger said she was doing well and had surgery scheduled for April. (R. 376). Dr.

Knight said that he discussed the results of her January urine drug screen with her. *Id.* The note

appears to state that he would give Stonebarger "a further chance" with one drug omitted from her

prescriptions while awaiting "the results of today's drug screen." *Id.*

The administrative transcript includes records that Stonebarger was seen at the practice of

David Shadid, D.O. from June 2007 through February 2009. (R. 346-53, 356-59, 404-12). On many

occasions Stonebarger was seen by K. Mulanax, ARNP, with the record signed by Dr. Shadid. On

June 20, 2007, Mr. Mulanax's impressions were PTSD, MDD (major depressive disorder), ADHD,

generalized anxiety disorder with panic attacks, and OCD. (R. 353). He rated Stonebarger's Global

Assessment of Functioning ("GAF")[1] as 60. *Id.* On July 5, 2007, Mr. Mulanax stated that Focalin

XR, Trazadone, and Zoloft were helping Stonebarger's symptoms, she was able to sleep well, and

she had no depression or anxiety. (R. 349). On September 13, 2007, Mr. Mulanax added in Effexor

and recommended that Stonebarger call ACT for therapy. (R. 346). On September 27, 2007, Mr.

Mulanax increased the Effexor and Focalin. (R. 359). Stonebarger reported on October 11, 2007

that she was doing better on the increased medications and she was to start therapy at ACT the next

---

[1]The GAF score represents Axis V of a Multiaxial Assessment system. *See* American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text
Revision 4th ed. 2000). A GAF score is a subjective determination which represents the
"clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale
is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by
delusions or hallucinations or serious impairment in communication or judgment . . . or inability
to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in
reality testing or communication . . . or major impairment in several areas, such as work or
school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects
"serious symptoms . . . or any serious impairment in social, occupational, or school functioning."
*Id*.

day. (R. 358). On November 26, 2007, Dr. Shadid stated that Stonebarger was functioning "extremely well" with no anxiety or depression. (R. 356-57). This note also stated that she had good success with her therapy at Family & Children's Services. *Id.*

On January 18, 2008, Stonebarger asked for changes in medications, reporting frustration and trouble with focus. (R. 412). She also reported increased anxiety and worrying. *Id.* On February 15, 2008, Stonebarger reported that she was doing better on the adjusted medications, and she had "started therapy" with Family & Children's Services. (R. 411). On April 15, 2008, Stonebarger again asked for an increase in medications. (R. 410). On May 15, 2008, she reported that she was doing better on the increased medications, and her GAF was stated as 65. (R. 409). She continued her medications and had appointments with Dr. Shadid's practice in June 2008, August 2008, December 2008, and February 2009. (R. 404-08).

The administrative record includes what appears to be an unsigned treatment plan from Family & Children's Services dated in October or November 2008. (R. 414-24). Axis I[2] diagnoses were major depressive disorder, recurring, without psychotic features, PTSD, and ADHD. (R. 423). Her GAF was assessed as 58, with highest GAF in the past year stated as 59. (R. 424). One note indicated that Stonebarger's "compliance with therapy sessions has been inconsistent." (R. 422).

Stonebarger was seen for a physical examination by agency consultant Jerry D. First, M.D. on April 12, 2007. (R. 296-302). She listed her complaints as lumbar back pain and falling easily. (R. 296). During physical examination, Dr. First said that Stonebarger was uncooperative and intermittently tearful. (R. 297). Her range of motion was normal except in her lumbar back, and

---

[2]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

she refused to move in any position to evaluate her range of movement for the lumbar back. (R. 298). Examination of her back showed some tenderness in the right lumbosacral region with pain radiating down to the back of the right hip. *Id.* Stonebarger needed her husband's assistance to sit up from a reclining position, but she then climbed off of the examination table and walked for a few steps without assistance or difficulty. *Id.* She used a cane in her right hand and walked down the hallway with a gait that Dr. First assessed as safe, stable, and of normal speed. *Id.* Dr. First's impressions were L4/L5 and L5/S1 disks with L5 degenerative vertebral disease, radiculopathy of the right leg secondary to the disk problems, obesity, and depression. *Id.*

A Physical Residual Functional Capacity Assessment was completed by agency nonexamining consultant Luther Woodcock, M.D. on May 15, 2007. (R. 321-28). Dr. Woodcock found that Stonebarger could occasionally lift 20 pounds, could frequently lift 10 pounds, and could stand, walk, or sit for about 6 hours in an 8-hour day. (R. 322). For the portion of the form calling for explanation, Dr. Woodcock reviewed Stonebarger's test results showing moderate to severe degenerative disk disease at the L5/S1 level, as well as changes at the L4/L5 level. *Id.* He noted that Stonebarger had normal range of motion at Dr. First's examination, except for her lumbar back, and he noted Stonebarger's refusal to move to evaluate her lower back's range of motion due to anticipated pain. *Id.* He noted that she was able to walk with the use of a cane with a normal gait. *Id.* For postural limitations, Dr. Woodcock found that Stonebarger could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. 323). He found no other limitations. (R. 324-28).

Stonebarger was seen for psychological evaluation by agency consultant Linda R. Craig, Psy. D., on April 4, 2007. (R. 291-95). Stonebarger's complaints included depression, low energy, lack of interest in activities, bouts of crying, guilt, weight change, sleep disruption, lack of ability to concentrate, indecision, irritability, anxiety, worrying, panic attacks, fear of people, uncontrolled

behaviors, and hallucinations. (R. 292). Dr. Craig noted that Stonebarger's mood was depressed, and her ability to focus and concentrate appeared compromised. (R. 291). Her memory was intact, her insight was fair, and her score on the MMSE (the Mini Mental Status Examination) was 29/30. *Id.* Dr. Craig's impressions on Axis I were dysthymic disorder, ADHD, and PTSD. (R. 293). On Axis II, Dr. Craig's impression was personality disorder not otherwise specified, with borderline traits. *Id.* She evaluated Stonebarger's GAF as 55. *Id.* In her summary, Dr. Craig stated that Stonebarger's ability to work was "mildly impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, and socially interacting with coworkers or public." *Id.*

A Psychiatric Review Technique form was completed by agency nonexamining consultant Ron Smallwood, Ph.D. on May 14, 2007. (R. 307-20). Dr. Smallwood noted Stonebarger's ADHD in category 12.02 of the form, noted her depressive disorder in category 12.04, and noted a personality disorder in category 12.08. (R. 308, 310, 314). For the "Paragraph B Criteria,"[3] Dr. Smallwood found that Stonebarger had moderate restriction of her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 317). In the "Consultant's Notes" portion of the form, Dr. Smallwood briefly summarized Dr. Craig's examination. (R. 319).

---

[3]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of ADLs, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

For the Mental Residual Functional Capacity Assessment, Dr. Smallwood found that Stonebarger was markedly limited in her ability to understand, remember, and carry out detailed instructions, and in her ability to interact appropriately with the general public. (R. 303-04). He found no other significant limitations. *Id.* In his summary, Dr. Smallwood stated that Stonebarger could perform simple tasks with routine supervision, could relate to supervisors and peers on a superficial work basis, could not relate to the general public, and could adapt to a work situation. (R. 305).

## Procedural History

Stonebarger filed applications on March 4, 2007 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.* (R. 129-37). The applications were denied initially and on reconsideration. (R. 61-69, 71-76). A hearing before ALJ Deborah L. Rose was held March 31, 2009 in Tulsa, Oklahoma. (R. 21-54). By decision dated April 28, 2009, the ALJ found that Stonebarger was not disabled at any time through the date of the decision. (R. 8-20). On October 29, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

13

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Stonebarger met insured status requirements through June 30, 2011. (R. 10). At Step One, the ALJ found that Stonebarger had not engaged in any substantial gainful activity since her alleged onset date of October 1, 2006. *Id.* At Step Two, the ALJ found that Stonebarger had severe impairments of degenerative disc disease of the lumbar spine; depression; personality disorder; and ADHD. *Id.* At Step Three, the ALJ found that Stonebarger's impairments did not meet a Listing. (R. 10-13).

The ALJ determined that Stonebarger had the following RFC:

> to perform light work [citation omitted] except for the following which would reduce the range of light work to lift and/or carry 10 pounds frequently; lift and/or carry 20 pounds occasionally; sit approximately 6 hours per day and stand and/or walk 6 hours in an 8-hour workday; occasionally climb, balance, stoop, kneel, crouch or crawl; occasional interacting with the public; and simple routine tasks.

(R. 13). At Step Four, the ALJ found that Stonebarger could not perform any past relevant work. (R. 18). At Step Five, the ALJ found that there were jobs that Stonebarger could perform, taking into account her age, education, work experience, and RFC. (R. 19). Therefore, the ALJ found that Stonebarger was not disabled at any time from October 1, 2006 through the date of her decision. (R. 20).

## Review

Stonebarger argues that the ALJ's decision is erroneous for several reasons relating to the opinion evidence, and she also argues that the ALJ's credibility assessment is not sufficient. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements, the ALJ's decision is affirmed.

**Issues Relating to Opinion Evidence**

*Other Source Opinion Evidence*

Stonebarger argues that the ALJ committed reversible error in her failure to discuss the letter written by Malinda Arrington, ARNP, asking that Stonebarger be allowed to participate in the Sooner Ride program because "it is painful [to Stonebarger] to walk or stand for long periods" due to her lumbar back condition.  (R. 271).  Stonebarger cites to *Frantz v. Astrue*, 509 F.3d 1299, 1300-01 (10th Cir. 2007).  In *Frantz*, the claimant was diagnosed with bipolar disorder, and the Tenth Circuit found that the ALJ did not properly consider opinion evidence from a clinical nurse specialist who had indicated that the claimant could not work due to numerous symptoms of her mental illness.  *Id.*  While the nurse was not an "acceptable medical source," she was an "other source," and the ALJ was required to discuss her opinion evidence and to describe the weight he gave to that evidence.  *Id.*

Here the ALJ did not discuss the February 2007 letter of Ms. Arrington, but the Court finds that this omission is not reversible error given the context of this case. First, the Court finds that it is not clear that the letter in question qualifies as true opinion evidence.  The Tenth Circuit in  *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform."  Thus, the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion.  *Id.  See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir.

2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations).

The contrast between the letter written by Ms. Arrington and an opinion that was required to be discussed is illustrated by a case cited by Stonebarger, *Carpenter*, 537 F.3d at 1267-68. In *Carpenter*, the Tenth Circuit found that the ALJ erroneously disregarded evidence of the claimant's chiropractor that she was "'challenged in her daily activities such as washing, bending, lifting, dressing, and taking care of her children,' due to her neck, shoulder, and lower back injuries, and that her pain will be permanent and worsen over time." *Id.* The court noted that the opinion of an "other source" was relevant to the questions of severity and functionality and stated that the ALJ "was not entitled to disregard the 'serious problems' set out in [the chiropractor's] opinion." *Id.* While the court did not explain the context of the chiropractor statements in detail, it appears that the opinion evidence was given in a context that addressed the questions of severity and functionality.

In contrast, the Court finds that the context of the letter in question tends to make the evidence not probative enough for the ALJ to be required to discuss it. The purpose of Ms. Arrington's letter was to explain in sufficient detail the reasons why Stonebarger needed to participate in the Sooner Ride program. Given that purpose, she explained that it was painful for Stonebarger to walk or stand for long periods, but there is no indication that Ms. Arrington intended this to be a general medical opinion regarding the severity of Stonebarger's condition or her functionality. *See, e.g., Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (unpublished) (disability parking placard was not relevant because of differing standards of disability); *Bryant v. Astrue*, 2010 WL 4628721 (D. Kan.) (treating physician's comment on application for a permanent disabled parking placard was not "so probative as to require

discussion"); *Livingston v. Astrue*, 2010 WL 5851124 (failure to mention parking permit application was not reversible error in part because such applications are "generally of little relevance to a formal disability analysis"); *Parmley v. Astrue*, 2008 WL 3850250 (E.D. Ky.) (ALJ was correct to disregard a handicap parking form completed by a treating physician because it did not indicate that the claimant was incapable of working); *Meador v. Barnhart*, 2006 WL 1319627 (W.D. Va.) (same). *But see Grabczyk v. Astrue*, 2010 WL 3894113 (D. Colo.) (parking permit application was treating physician opinion evidence, and ALJ did not give sufficient reasons for rejection); *Bailey v. Astrue*, 2010 WL 3834406 (E.D. Okla.) (same).

While there are some non-controlling authorities, such as the *Grabczyk* and *Bailey* cases cited above, that consider a disability parking permit application to be treating physician opinion evidence that must be discussed, here the circumstances are more tangential than in those cases. Ms. Arrington was an "other source," not a treating source, she apparently only saw Stonebarger twice ( R. 271-75), and her statements asking that Stonebarger be permitted to participate in the Sooner Ride program because "it is painful [to Stonebarger] to walk or stand for long periods" were closer to generalized statements that do not require discussion than to the specific statements of the chiropractor in *Carpenter* that addressed severity and functionality and did require discussion. To be clear, the undersigned finds that it would have been better practice for the ALJ to discuss the letter in question, but the Court also finds that the ALJ's failure to do so was not reversible error under the circumstances of this case.[5]

---

[5] A reviewing court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Here, the ALJ's failure to discuss the February 2007 letter is analogous to the failure of the ALJ to discuss the claimant's cardiac problems in *Big Pond v. Astrue*, 280 Fed. Appx. 716, 719 n.2 (10th Cir. 2008) (unpublished). The Tenth Circuit rejected an argument that the Commissioner engaged in *post hoc* justification of the ALJ's decision when

Stonebarger also cites to the basic principle of *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996), that the ALJ must discuss uncontroverted evidence that she chooses not to rely upon as well as significant probative evidence that she rejects.  As stated above, in the view of the undersigned the February 2007 letter was not significant probative evidence, and it certainly was not uncontroverted, because the nonexamining agency consultants found that Stonebarger had the exertional ability to stand and/or walk for 6 hours in an 8-hour workday.  (R. 322, 355).  Again, under the circumstances of this case, it was not reversible error for the ALJ to omit a discussion of Ms Arrington's letter.

The Court also finds Stonebarger's argument that the ALJ had a duty to recontact Ms. Arrington to be unpersuasive. This is not a situation where the evidence from Stonebarger's treating physicians was inadequate to determine whether Stonebarger was disabled.  *Stokes v. Astrue*, 274 Fed. Appx. 675, 688 (10th Cir. 2008) (unpublished), *citing White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001).  Instead, the letter from Ms. Arrington simply was not sufficiently probative to trigger the ALJ's duty to address it as "other source" opinion evidence. Stonebarger's argument would require an ALJ to recontact a source any time there was a vague statement that did not amount to probative opinion evidence.  That would be a nonsensical outcome and one that is not required by the law.

---

the issue raised by the claimant was that the ALJ had failed to discuss her cardiac problems:

> We have simply reviewed the record in order to determine whether, and then to illustrate why, the ALJ's omissions were not legal error.  The ALJ was not required to provide grounds in the decision for failing to do what was not required.  Thus, neither we nor the Commissioner have relied on a substitute rationale for upholding the ALJ's decision.

*Id.*

*Moderate Restriction in Concentration Persistence or Pace*

Stonebarger next makes an argument that because Dr. Smallwood, the nonexamining agency consultant, found for the Paragraph B Criteria that Stonebarger had a moderate restriction in her concentration, persistence, or pace (R. 317) that Dr. Smallwood was required to find that Stonebarger had a limitation in her ability to maintain attention and concentration for extended periods, a specific function included on the Mental Residual Functional Capacity Assessment form (R. 303). A one-for-one correlation of those two items would be absurd, given the different structure and purpose of the two forms. The Paragraph B Criteria are only four broad categories, while the Mental Residual Functional Capacity Assessment includes 20 different specific functions that are listed under headings of "understanding and memory," "sustained concentration and persistence," "social interaction" and "adaptation." For the Paragraph B Criteria, Dr. Smallwood found that Stonebarger had a moderate restriction in her concentration, persistence, or pace, but that does not mean that he was required to find an impairment in all eight of the specific functions listed under the heading of "sustained concentration and persistence" on the Mental Residual Functional Capacity Assessment form. It was Dr. Smallwood's job to find which specific functions were implicated by Stonebarger's concentration issues, and he made that finding: that Stonebarger was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 303-04). That Dr. Smallwood's opinion did not include the other specific function identified by Stonebarger is not a conflict in his opinion evidence. *Norris v. Barnhart*, 197 Fed. Appx. 771, 775 (10th Cir. 2007) (unpublished) (separate measures on Mental Residual Funcational Capacity Assessment form did not conflict with examining consultant's opinion evidence). Stonebarger's position on this point has no merit.

*Limitation Regarding Contact with the Public*

Next Stonebarger contends that the ALJ misstated the agency consultant's evidence on her ability to have contact with the public when she decided in the RFC determination that Stonebarger could have only "occasional interacting with the public." (R. 13). Stonebarger's argument is based on the narrative summary provided by Dr. Smallwood as part of the Mental Residual Functional Capacity Assessment, in which Dr. Smallwood found that Stonebarger was markedly limited in her ability to interact appropriately with the general public. (R. 303-04). In his summary, Dr. Smallwood stated that Stonebarger "cannot relate to the general public." (R. 305). Stonebarger argues that "occasional interacting with the public" was a change or a failure to adopt the opinion of the consultant that Stonebarger "cannot relate to the general public" that was required to be explained by the ALJ. The undersigned views the ALJ's language as a sufficient accommodation of the limitation found by the consultant, and she was not required to parrot the exact wording of the consultant.[6] In *Breneiser v. Astrue*, 241 Fed. Appx. 840, 843-44 (10th Cir. 2007) (unpublished), the ALJ adequately addressed the various opinion evidence when he included in his RFC that the claimant "required work where there is not extensive contact with co-workers, supervisors, and the public." Here the ALJ adequately addressed the opinion evidence by including a limitation that Stonebarger could only occasionally have contact with the public.

*Weight Given Opinion Evidence*

Finally, Stonebarger challenges the ALJ's statement that "[a]s for the opinion evidence, it

---

[6]The finding of the examining consultant, Dr. Craig, that Stonebarger's ability to work was only "mildly impaired" with respect to "socially interacting with coworkers or public" is substantial evidence that supports the ALJ's RFC determination on this point. (R. 293).

is consistent and is accorded full weight." ( R. 18). Stonebarger states that this does not make clear which opinion evidence the ALJ relied upon and disregards the opinion evidence given by Ms. Arrington. The Court has fully addressed the reasons why it was not reversible error for the ALJ to fail to discuss Ms. Arrington's February 2007 letter. The sentence complained of is "clear enough" in the context of the entire decision, that the ALJ relied upon the opinion evidence of the examining and nonexamining agency consultants. *See Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (portions of claimant's testimony that were credited were "clear enough" while ALJ's discussion was summary). The ALJ made this more clear in her next sentence when she stated that "[i]n summary, the above residual functional capacity assessment is supported by examination and opinions of Dr. Woodcock, Dr. First, and Dr. Craig." (R. 18). Other than the issues already discussed by the undersigned, Stonebarger raises no other issues of inconsistencies in these opinions. The Court finds that the opinion evidence cited by the ALJ was substantial evidence that supported her RFC determination, and therefore the ALJ's decision is affirmed.

**Credibility**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ devoted a considerable portion of her decision to her analysis of Stonebarger's credibility. (R. 17-18). She noted Stonebarger's testimony regarding her activities of daily living, her description of her pain, her medications, and her medical treatment. *Id.* She noted that Stonebarger had not been diligent in pursuing a recommended course of treatment of surgery for her back. *Id.* She also noted that the records from Dr. Shadid and Dr. Knight stated that Stonebarger was doing well on her medications, and this conflicted with Stonebarger's testimony. (R. 18). These are both specific legitimate reasons for the ALJ's finding that Stonebarger's testimony was not fully credible, and she linked those reasons to substantial evidence.

Stonebarger first complains of the ALJ's analysis of her activities of daily living. Plaintiff's Brief, Dkt. #15, p. 5. The undersigned does not view the ALJ's discussion of Stonebarger's activities of daily living as one of her specific legitimate reasons for her credibility assessment, but rather that it was included for completeness. Therefore, Stonebarger's complaints about this portion of the ALJ's decision are not relevant. Similarly, Stonebarger complains that the ALJ left out some of her medications when she was listing them. Plaintiff's Brief, Dkt. #15, p. 6. Again, the undersigned does not believe that the ALJ was relying on medications in her credibility analysis, but was noting that Stonebarger did have a number of medications that she took. The Court finds that the ALJ did not "pick and choose" the medications in an attempt to slant the evidence against Stonebarger, and Stonebarger's complaints are not persuasive.

Stonebarger then addresses the ALJ's reliance on her lack of diligence in pursuing an appointment to schedule surgery on her back, arguing that she has been ambivalent about pursuing surgery. Stonebarger's asserted ambivalence, and the authorities she cites relating to

whether a refusal to have surgery can be used in a credibility analysis are not applicable to the

ALJ's reason for finding Stonebarger less than credible in this case.  At the hearing on March 31,

2009, the ALJ questioned Stonebarger specifically on the status of possible surgery on her back.

Stonebarger explained that the surgeon's office had told her that she needed to go see her new

primary care physician in order to get a referral back to the surgeon.  (R. 44).  The ALJ asked

when she got this information, and Stonebarger said this had happened recently, "maybe the

second week in March."  *Id.*  Stonebarger then said the surgeon's assistant told her she needed to

get an appointment, "which I plan to do."  (R. 45).   The ALJ asked her why she hadn't done that

yet, and Stonebarger's response was not clear.  *Id.*  Stonebarger responded that she didn't know

why, although she also said that she didn't understand or she was mad that she had to make

another appointment.  *Id.*  It was legitimate for the ALJ to view this testimony as reflecting on

Stonebarger's credibility, in that she had delayed for perhaps two or more weeks in making an

appointment that would eventually get her treatment for the back condition that she asserted was

disabling.  *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000) (failure to seek treatment

was legitimate reason for ALJ's credibility assessment); *Harris v. Astrue*, 285 Fed. Appx. 527,

531 (10th Cir. 2008) (unpublished) (claimant's failure to return to neurosurgeon for treatment

when her pain became more severe was one legitimate reason supporting the ALJ's credibility

assessment).

Stonebarger makes many more complaints about the ALJ's credibility assessment, mostly

in the line of reasoning that the ALJ ignored evidence or factors that might have been favorable

to Stonebarger's credibility while selectively choosing evidence that supported her credibility

assessment.  Plaintiff's Brief, Dkt. #15, pp. 7-10.  The Court finds that the ALJ's decision is

thorough and does not impermissibly "pick and choose" evidence supporting a finding of

nondisability while ignoring evidence favorable to Stonebarger's claim. (R. 14-16); *see Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (ALJ "not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability").

Stonebarger's multiple arguments regarding the ALJ's credibility assessment constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines that invitation. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence). All of the arguments made by Stonebarger essentially are that Stonebarger would like for this Court to give more weight to the evidence that is in her favor and less weight to the evidence that disfavors her claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted).

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 29th day of March, 2011.

25

Paul J. Cleary
United States Magistrate Judge